### UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, ) | |
| ) | |
| Plaintiff, ) | CASE NO.  23-CV-1853 |
| v. ) | |
| ) | |
| MATTHEW M. MOTIL ) | |
| NORTH SHORE EQUITY SALES, LLC, d/b/a ) | JURY DEMANDED |
| THE MARIE PAUL COMPANY; ) | |
| NORTH SHORE EQUITY MANAGEMENT, LLC; ) | |
| ) | |
| Defendants, ) | |
| ) | |
| AMY DOUBRAVA MOTIL, ) | |
| ) | |
| Relief Defendant. ) | |

## COMPLAINT

Plaintiff, the Securities and Exchange Commission ("SEC"), alleges as follows:

## SUMMARY

1.      For almost four years, Matthew M. Motil ("Motil") devised and carried out an offering fraud and Ponzi scheme that defrauded investors of millions of dollars. He promised investors short-term, low-risk, and high-return promissory notes supposedly fully collateralized by first mortgages on residential real estate located throughout Ohio. Motil falsely told investors that he would use their investments to renovate the properties and pay them back with profits from reselling the properties, refinancing them, or renting them. Nearly everything about his scheme was a lie. Many of the promissory notes he offered and sold to investors were not "fully collateralized by first mortgages" because Motil purposely issued multiple promissory notes "secured" by the same property to numerous investors.

1

2.      In one instance, Motil obtained over $1.3 million from at least twenty separate investors, issuing at least twenty notes "secured" by one single-family home that was purchased for $47,000 and never valued at more than $130,000. Despite promising many investors that he would record their mortgages, Motil failed to do so. Ultimately, Motil used investor funds to (1) make over $3.7 million in Ponzi payments; (2) spend over $1.6 million on personal expenses; (3) divert over $900,000 of investors' money to other businesses unrelated to real estate, and (4) route hundreds of thousands more to his wife, Amy Doubrava Motil ("Amy Motil" or "Relief Defendant"). Motil intentionally or recklessly failed to disclose any of this to his investors.

3.      From as early as October 2017 through May 2021 (the "Relevant Period"), Motil, operating through North Shore Equity Sales, LLC d/b/a The Marie Paul Company ("NS Sales"), North Shore Equity Management, LLC ("NS Management") and a variety of other LLCs that he created, raised over $11 million from more than 60 investors located across the United States. Motil persuaded individuals, including a cancer researcher and an active-duty U.S. Air Force Lieutenant Colonel, to invest their retirement funds and life savings with him by advertising his own financial acumen and track record of success.

4.      After Motil's Ponzi scheme collapsed, he filed for personal bankruptcy in March 2022, seeking to discharge the millions of dollars he personally owed to the investors he had victimized. In his bankruptcy petition, Motil failed to divulge that his debts were from his Ponzi scheme. Instead, Motil identified the victimized investors as his "creditors," claiming that his personal debts arose from "guarantees of debts of [Motil] LLCs." However, in response to the Amended Complaint filed by the U.S. Trustee in its adversarial proceeding, Motil contended that the victim-creditors of his Ponzi scheme are creditors of corporations and LLCs that Motil owned.

5.      Motil actively participated in his bankruptcy case but has ignored numerous SEC

administrative subpoenas for testimony and documents served upon him personally.

6.      As a result of the conduct described in this Complaint, the Defendants violated Sections 5(a) and (c) and 17(a) of the Securities Act of 1933 ("Securities Act"), [15 U.S.C. §§ 77e(a), (c), and 77q(a)]; and Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934 ("Exchange Act"), [15 U.S.C. § 78j(b) and 17 C.F.R. §240.10b-5]. Unless restrained and enjoined, they are reasonably likely to continue to violate the federal securities laws.

7.      The Commission seeks a judgment from the Court: (i) permanently enjoining the Defendants from violating the applicable provisions and rules of the federal securities laws as alleged and asserted below; and from participating directly or indirectly in the issuance, purchase, offer or sale of any security (provided that such order would not prevent Defendants from buying and selling securities listed on a national securities exchange for their respective personal accounts); (ii) barring Motil from becoming an officer or director of a public company; (iii) directing the Defendants to disgorge all net profits they received as a result of the acts and/or courses of conduct complained of, with prejudgment interest; (iv) directing the Defendants to pay civil money penalties; (v) creating a Fair Fund pursuant to Section 308(a) of the Sarbanes-Oxley Act; (vi) ordering Relief Defendant to disgorge any ill-gotten gains plus prejudgment interest thereon; and (vii) granting such other and further relief as this Court may determine to be just, equitable, and necessary.

## JURISDICTION AND VENUE

8.      The SEC brings this action pursuant to Section 20(b) of the Securities Act [15 U.S.C. §77t(b)], and Sections 21(d) and 21(e) of the Exchange Act [15 U.S.C. §§78u(d) and 78u(e)]. In connection with the conduct described herein, Defendants directly or indirectly made use of the means or instrumentality of interstate commerce, or of the mails, in connection with

their actions as alleged in this Complaint. Throughout the Relevant Period, Defendants solicited and received funds from investors throughout the United States by interstate wire transfers, and Motil communicated with and solicited out of state investors via his website, various social media accounts, and/or by telephone and e-mail.

9.      Venue is proper in this Court pursuant to Section 27 of the Exchange Act [15 U.S.C. § 78aa]. Motil and Amy Motil reside and can be found in this District, and certain of the acts, practices and courses of business constituting the violations alleged herein occurred within this District. Specifically, many of the residential real estate properties involved in Motil's fraud are located within this District.

## DEFENDANTS

10.      **Motil**, age 42, is a resident of North Olmsted, Ohio, and is the owner and principal of NS Sales and NS Management and each related party described below. Motil is an Ohio-licensed Professional Engineer, and a self-described entrepreneur and real estate expert. Motil holds a Ph.D. and an MBA, and has claimed to have a J.D. majoring in Intellectual Property, earned in one year from the University of Akron School of Law. Motil created and controlled numerous bank accounts at JPMorgan Chase Bank NA in the names of NS Sales, NS Management, the related parties (and others) that he used to facilitate the fraudulent scheme described herein (each a "Chase Account" and collectively the "Chase Accounts"). On March 7, 2022, Motil filed a voluntary petition under Chapter 7 of the Bankruptcy Code for personal bankruptcy in the Bankruptcy Court for the Northern District of Ohio.

11.      **NS Sales** is an Ohio LLC created and controlled by Motil with its principal place of business in Ohio. NS Sales also used a number of registered trade names including "The Marie Paul Company." NS Sales held properties and issued promissory notes to investors that contained

4

materially false and misleading statements and/or omissions. Motil instructed investors to deposit their money into a Chase Account in the name of NS Sales. Motil used the funds in the NS Sales Chase Account for personal expenditures, as well as to make payments due to previous investors ("Ponzi Payments") and to businesses unrelated to real estate. NS Sales is not registered with the Commission in any capacity.

12. **NS Management** is an Ohio LLC created and controlled by Motil with its principal place of business in Ohio. Like NS Sales, NS Management held properties and issued promissory notes to investors that contained materially false and misleading statements and/or omissions. Motil also requested that some investors transfer their money to a Chase Account in the name of NS Management. Motil used the funds in the NS Management Chase Account for personal expenditures, as well as to make Ponzi Payments and payments to businesses unrelated to real estate. Motil also transferred investor funds from the Chase Account in the name of NS Sales to the Chase Account in the name of NS Management, where it was used to make Ponzi Payments, to pay personal expenses and make payments to businesses unrelated to real estate.

## RELIEF DEFENDANT

13. **Amy Motil**, age 35, is married to Motil and resides in North Olmsted, Ohio. Certain banking records list Amy Motil as "COO" and 50% owner of NS Sales, and as a "Member" of NS Management. Amy Motil received at least $400,000 of investor money.

## RELATED PARTIES

14. BUYCLE112, LLC; BUYCLE114, LLC; BUYCLE158, LLC; BUYCLE175, LLC; BUYCLE176, LLC; INVCLE150, LLC; NS Equity Cleveland, LLC; NSEM Mansfield 1, LLC; and NSEM Mansfield 2, LLC (each a "Motil LLC" and together "the Motil LLCs") are all Ohio

LLCs that were created and controlled by Motil. The Motil LLCs held real estate and/or issued promissory notes that contained materially false and misleading statements and/or omissions.

## FACTS

### I.     Motil's Solicitation Efforts

15.     During the Relevant Period, Motil described himself as a self-made real estate entrepreneur who helped "hundreds of investors throughout the world to create massive wealth through real estate." He advertised himself using his website at http://www.drmattmotil.com (the "Motil Website") and numerous social media accounts (including accounts at Facebook, LinkedIn and Biggerpockets.com) and podcasts.

16.     The Motil Website told prospective investors that Motil had "investment opportunities ranging from $10,000 to $10 million," and invited those who visited the website to "Be a Real Estate Investing Badass!" and to "fire [their] boss, quit [their] 9 to 5, and build a business/lifestyle [they] love earning a passive income from real estate investments." The Motil Website and Motil's social media accounts offered links to podcasts on Apple and YouTube entitled "*The Cash Flow King, The **Realest** Real Estate Podcast,*" hosted by "Doctor Motil."

17.     A former employee of Motil testified under oath that they believed that the podcast was part of a broader media presentation to convince people to invest with Motil and his companies. Motil released approximately 147 episodes of the podcast.

18.     In one podcast dated November 8, 2019 titled "*Funding Back Private Money,*" Motil talked at length about the "huge level of responsibility" that comes with accepting real estate investments from individuals. He said:

> When someone has worked at a job or a business . . . there's a significant level of effort that has gone into the creation of that capital. And so when [people] are willing to take that [money] and hand it to you in good faith, [there's an obligation] that you're going

6

to turn it around and give them a nice return on their money. They have put a lot of faith in you. And you have a significant level of responsibility to make sure that, not only are you doing what you said you were going to do, but you give them the return that you promised. . . . [**w]e don't do unsecured notes so . . . we're doing a promissory note and a mortgage, one investor-one deal and so you're first lien position on the property, just like a bank**.

(emphasis added). When Motil made this statement, which he knew or recklessly failed to know was false, he had already defrauded numerous investors; after making this statement, he continued to defraud investors for well over a year.

19.     Through the Motil Website and certain social media accounts he controlled, Motil invited visitors to submit their e-mail address to receive copies of his newsletter and to schedule a call to speak with him directly. Once investors signed up for the newsletter or scheduled a phone call, Motil typically solicited them directly by e-mail with "private lending opportunities" that briefly described, in bullet-point format, several promissory notes.

20.     The descriptions included: (i) their principal amounts; the applicable annual percentage rate ("APR") (usually 8%-15%); (ii) the term (usually 6-18 months); and sometimes (iii) a brief description of the residential property that would collateralize the promissory note (such as the number of bedrooms and baths and a property valuation estimate). Motil does not appear to have attempted to screen accredited investors.

21.     In his conversations with investors, Motil often told them, among other things, that he bought houses, renovated them, and either sold them at a profit or refinanced them and rented them. He often emphasized that investors would play an entirely passive role and they would not need to participate in the renovation, rental or refinancing of the property. Motil told multiple investors that they essentially would be "acting as a bank" because their funds would be secured by a first position mortgage lien on the property and they would receive interest payments and, at

the end of the term, their principal. Motil knew or recklessly failed to know that this was false. Motil also told investors on numerous occasions (sometimes in writing and sometimes orally) that after he received their investment he would record the mortgage with the county clerk, knowing or recklessly failing to know that this was false.

## II.     The Investments Offered By Motil

22.     After an investor selected a particular investment from among Motil's list of "private lending opportunities," Motil created and issued a promissory note corresponding to the investor's choice (the "Notes"). The Notes set forth, among other things, the APR, the repayment schedule, the address of the property that would purportedly collateralize the Note, and the name of the entity (usually a Motil LLC, but sometimes NS Sales or NS Management) that Motil identified as the borrower. Motil signed the Notes on behalf of the borrower.

23.     Motil also sent investors a document he created titled "Mortgage." The mostly-boilerplate language in the Mortgages generally contained covenants prohibiting Motil from creating or accruing any debt, lien or charge that would have priority over the Note received by the investor. The covenants in the Mortgages underscored what Motil told many investors orally: their investments were collateralized by first position mortgages on residential properties.

24.      In addition to the Notes and Mortgages, Motil also sent payment instructions for investors to fund their Note. Motil typically instructed investors to send their money to a Chase Account. Motil specifically told numerous investors that after he received their money he would record the mortgage and they would receive a signed copy of the recorded mortgage mailed directly from the appropriate county clerk.

25.     Motil often told investors that the county clerks were backlogged and that it took several weeks or months to send their recorded mortgages. But Motil was just buying time. He

8

knew that county clerks could not possibly mail a copy of the recorded mortgages because, among other things, Motil rarely recorded the mortgages. In fact, Motil admitted under oath during his Section 341(a) bankruptcy hearing, that he only recorded mortgages "a couple times, if . . . asked."

26.     Motil's failure to record the mortgages not only contradicted his written and oral assurances to investors, it also enabled Motil to sell multiple Notes "collateralized" by the same property to different investors. If prospective investors searched county title records, they would be unable to discover that the property purportedly collateralizing their investment was already encumbered by a mortgage. Motil knew, or was reckless in not knowing, that the properties were not secured by first mortgages simply because there could only be one first mortgage, and, in many instances, Motil had already issued mortgages on the same property to numerous investors.

### III.     Motil Forged A Notary's Signature and Misused A Notary Seal On Investors' Mortgages

27.     In October 2018, Motil hired an assistant who was tasked with, among other things, obtaining a notary commission and notarizing mortgage agreements. The assistant carried out her task of notarizing mortgages until September 2019, when Motil gave her a new assignment.

28.     Motil then forged her signature as a notary and affixed a counterfeit version of her notary seal to mortgages. Beginning in approximately September 2019, Motil forged the notary's signature and affixed her seal on at least thirty mortgages. This continued even after the notary left Motil's employ in February 2020. By forging her signature and falsely affixing her seal, Motil intentionally or recklessly caused the mortgages to become un-recordable under Ohio law. Motil intentionally or recklessly failed to tell investors that he was forging a notary's signature and seal on their "mortgages." This omission was material because a reasonable investor would have wanted to know that Motil – the expert "Cash Flow King" who had helped hundreds of investors, in whom they were placing their trust – was falsifying a notary's stamp and signature on official

documents.

29.     Motil's former employee filed a formal police report after she learned that he had forged her signature and used a counterfeit version of her notary seal.

## IV.     Motil Misled Investors By Failing to Disclose That He Sold Multiple Notes Secured by Single Properties

30.     Motil intentionally sold multiple Notes, each supposedly collateralized by a single property, to dozens of investors, defrauding them of millions of dollars.

31.     From November 2017 to May 2021, Motil sold Notes that were all purportedly collateralized by the same residential property located at 13410 Wainfleet Avenue in Cleveland (the "Wainfleet Property") to at least fifteen separate investors,. Though Motil acquired the Wainfleet Property (through a Motil LLC) in November 2017 for only $35,000, he used the property to "collateralize" Notes worth at least $502,971. When Motil sold his last Wainfleet Property Note, he owed at least $393,000 to at least 12 investors, bringing the total outstanding principal to $433,000. At the time, home valuation services Corelogic, Quantarium, and Collateral Analytics valued the Wainfleet Property at between $60,745 and $76,000.

32.     Similarly, Motil intentionally or recklessly sold Notes that were all purportedly collateralized by the same single-family residence located at 13529 Leroy Avenue in Cleveland (the "Leroy Property") to at least seventeen investors. Though Motil bought the Leroy Property (through a Motil LLC) in August 2017 for $51,000, he used the property to "collateralize" Notes worth at least $853,000. When Motil sold his last Note purportedly collateralized by the Leroy Property in April 2021, he owed over $610,000 to 12 investors, bringing the total outstanding principal to over $635,000. Corelogic, Quantarium, and Collateral Analytics never valued the property at more than $118,600.

33.     Beginning in November 2019, Motil intentionally or recklessly sold Notes that

were all purportedly collateralized by the same multi-family property located at 4027 Rocky River Drive, in Cleveland (the "Rocky River Property") to at least ten investors. Motil bought the Rocky River Property (through a Motil LLC) in December 2018 for $931,000, but used it to "collateralize" Notes worth over $2.6 million. By May 2020, when Motil sold his last Note "collateralized" by the Rocky River Property, he owed investors in the property a total of over $2.2 million. One of Motil's investor victims, Investor A, lost approximately $429,240 from her IRA account on the Rocky River Property alone. (See *infra* ¶¶ 42-47).

34.     Beginning in November 2017, Motil intentionally or recklessly sold Notes that were all purportedly collateralized by the same property located at 3318 Hearthstone Road in Parma, Ohio, (the "Hearthstone Property") to at least twenty investors. Motil bought the Hearthstone Property in November 2017 for only $47,000, but by January 2021, had used it to "collateralize" notes worth over $1.3 million. Corelogic, Quantarium, and Collateral Analytics never valued the property as worth more than $130,000. When Motil sold his last note on the Hearthstone Property, he owed investors in the property a total of over $1.1 million.

35.     Beginning in September 2019, Motil intentionally or recklessly sold Notes that were all purportedly collateralized by the same property located at 3593 West 50th Street in Cleveland, Ohio (the "W 50th Street Property") to at least ten investors. He bought the W 50th Street Property in September 2019 for only $30,000, but by January 2021, had used it to "collateralize" notes worth over $330,000. By January 2021, Motil owed investors approximately $307,000.

36.     Motil intentionally or recklessly failed to tell investors in the Wainfleet, Leroy, Rocky River, Hearthstone, and W 50th Street Properties that he had already sold multiple Notes on the same properties. And he intentionally or recklessly failed to inform investors that he intended

to continue to encumber the already-overburdened properties with additional "mortgages."

37.     These misstatements – and Motil's failures to disclose to investors that there were already existing liens on these properties – were material. Reasonable investors would have wanted to know that these properties were grossly over-leveraged and that other investors were already promised a share of whatever "profits" Motil expected to earn.

**V.     Motil Misused Investors' Funds on Ponzi Payments and Personal Expenses**

38.     Motil intentionally misappropriated the funds transferred by investors to the Chase Accounts by making Ponzi payments, moving money to businesses unrelated to real estate, and paying personal expenses. Overall, during the Relevant Period, Motil raised over $11 million from unsuspecting investors. He used over $3.7 million (or 33%) on Ponzi payments; over $900,000 (9%) on transfers to other businesses unrelated to real estate, $400,000 on transfers to his wife, and $1.6 million on personal expenses.

39.     These personal expenses included over $1,000,000 in personal credit card charges, over $107,000 on a seven-month rental of a lakeside mansion; over $73,000 for courtside seats to the Cleveland Cavaliers; over $45,000 to repay student loans; over $37,000 on purchases from Best Buy; over $23,000 on "Leeny's Lean Body"; over $22,000 on iTunes, over $14,000 at Starbucks; over $13,900 at numerous pizzerias; and $58,000 in cash withdrawals. Motil never disclosed that *any* investor funds would be used on Ponzi payments, on unrelated businesses, or on personal expenses, let alone approximately 60% of investor money.

40.     Without a constant inflow of new money from investors, Motil's operations were unsustainable because the cash income from his real estate business operations was insufficient to make payments due to investors, make payments to other businesses, and to pay personal expenses.

## VI.  Specific Examples of Motil's Fraud and Misuse of Investor Funds

### A.  Investor A

41.     Investor A, a resident of Massachusetts, learned about investing with Motil in approximately August 2018. After making contact with Motil, Investor A scheduled a phone call to discuss Motil's investment opportunities. During their ensuing discussion, Motil said, among other things, that Investor A would be "like a bank" and that her investment would be secured by a mortgage on a multi-family residential property in Ohio. During the discussion, and in later e-mails, Investor A made clear that she would be investing her retirement funds, which was or should have been obvious to Motil because Investor A was transferring her funds from her 401k account into a self-directed IRA account.

#### 1.  Investor A's Initial Investment: Rocky River Property

42.     Motil offered Investor A an 18-month Note with a 12% APR that would pay monthly interest of $4,380 and a balloon payment of $438,000, consisting of the entire invested amount of $429,240 plus a 2% bonus at the end of the 18-month term. This Note listed the Rocky River Property described in ¶ 33, *supra*, as collateral. Relying on Motil's representations, Investor A agreed in October 2018 to invest with a Motil LLC in a Note with a face amount of $438,000 (the "Rocky River Note"). Motil also gave Investor A a document titled "Mortgage" that prohibited Motil from encumbering the Rocky River Property.

43.     On or about November 19, 2018, Investor A authorized the transfer of $429,240 from her self-directed IRA into an NS Sales Chase Account to fund her investment in the Rocky River Note. Immediately thereafter, Motil misused Investor A's funds by making Ponzi payments totaling at least $85,000 to twenty investors ($16,000 to individual investors and $69,000 to institutional investors). He also used over $47,000 to pay personal credit cards and over $20,000

13

to pay personal expenses such as $3,100 for student loans, $2,500 to "Leeny's Lean Body" and $1,330 to iTunes.

44.     Motil's statements to Investor A concerning the Rocky River Note were materially false and misleading. Motil never told Investor A that her investment would be used to pay personal expenses and to make Ponzi payments owed to other unsuspecting investors. A reasonable investor would have wanted to know that Motil did not intend to use her investment for business purposes.

45.     Motil also failed to tell Investor A that he needed additional financing to acquire the Rocky River Property, which would deprive her of the "first position" lien he had promised. Motil ultimately borrowed, and personally guaranteed the prompt payment of, $845,000 from an institutional lender that held a first position lien on the Rocky River Property. In December 2018, Motil purchased the Rocky River Property in the name of a Motil LLC, using $765,000 from the institutional loan and $228,000 from Investor A's funds (roughly half of what Investor A provided). By issuing the mortgage to the institutional lender, Motil disregarded the provision in Investor A's Rocky River Mortgage which prohibited him from encumbering the Rocky River Property. The institutional lender could not determine that Motil had previously issued a mortgage to Investor A because Motil omitted it from the loan documents provided to the lender and because Motil failed to record Investor A's Rocky River Mortgage.

46.     Even after Motil borrowed $845,000 from the institutional lender, he disregarded the terms of that mortgage by issuing eight additional Notes and mortgages to eight separate investors totaling at least $1,386,000, all purportedly collateralized by the Rocky River Property. Motil never informed Investor A about the other investors who were holding notes secured by the Rocky River Property. These omissions were material because a reasonable investor would have

wanted to know that the property supposedly securing her investment was grossly overleveraged and that another investor had priority over her.

47.     Motil's Ponzi scheme lacked a sufficient, legitimate source of cash to fund his operations, such as rent, property resale, or cash-out refinances—material facts that Motil omitted to tell Investor A or other prospective investors. Because he lacked a sufficient, legitimate source of cash, Motil took funds from other unsuspecting investors to make monthly Ponzi payments to Investor A, but he never paid the $438,000 principal due on the Rocky River Note.

### 2.  Investor A's Modification & Second Investment: The Olivesburg Property

48.     By September 2019, Investor A had accumulated approximately $49,500 in her self-directed IRA. This amount included $40,880 of interest payments received in connection with Investor A's Rocky River Note and additional IRA contributions. Motil contacted Investor A and explained that the $49,500 cash balance in her IRA was not earning interest. He suggested that Investor A instead invest those funds in another Note. Motil offered Investor A a $48,000 Note "secured" by a property located at 6220 Olivesburg Fitchville Road in Greenwich, Ohio (the "Olivesburg Property").

49.     On or about September 30, 2019, Investor A agreed to invest the $48,000, and Motil sent her a Note signed by Motil on behalf of a Motil LLC ("Investor A's Olivesburg Note"). Investor A's Olivesburg Note had a stated effective interest rate of 11%, and instead of providing periodic interest payments, had a scheduled one-time balloon repayment of $66,278 due in October 2022. On or about September 30, 2019, Investor A followed Motil's instructions to authorize her IRA Custodian to make the $48,000 transfer to the NS Sales Chase Account. Motil provided Investor A with an Olivesburg Note and an accompanying document titled "Mortgage."

50.     Although Investor A's Olivesburg Note was supposed to be secured by a mortgage

15

on the Olivesburg Property, Motil never recorded Investor A's mortgage, leaving Investor A's Olivesburg Note unsecured. Furthermore, when Motil solicited Investor A to invest in Investor A's Olivesburg Note, he had already issued one "mortgage" on the Olivesburg Property to Investor B (*see infra* ¶¶ 62-63) and a second "mortgage" on the same property for $200,000 to another investor.

51.     Because Motil never recorded the prior "mortgages," there was no way that Investor A could have discovered the prior encumbrance on the Olivesburg Property. Motil intentionally or recklessly failed to inform Investor A about the other investors who were already holding notes secured by the Olivesburg Property. This omission was material because a reasonable investor would have wanted to know that the supposed "security" for their investment already served as the "security" for two other larger loans. Motil never paid the $66,278 due on Investor A's Olivesburg Note.

### 3.  Investor A's Third Investment: Hearthstone Road

52.     In or about mid-January 2021, Motil offered Investor A yet another investment opportunity: a $100,000 Note, secured by a property located at 3318 Hearthstone Road in Parma, Ohio. On or about January 27, 2021, Investor A agreed, investing $100,000 in a Hearthstone Note that was scheduled to pay $1,250 monthly interest (15% APR) for 6 months and a final balloon repayment of $100,000 at the end of the 6-month term ("Investor A's Hearthstone Note"). On or about January 27, 2021, Investor A followed Motil's instructions and transferred $100,000 from her savings account to the NS Sales Chase Account. Motil provided Investor A with her Hearthstone Note, which he signed on behalf of a Motil LLC. Motil also sent Investor A a document titled "Mortgage."

53.     When Motil offered Investor A's Hearthstone Note, he failed to disclose that he

had been experiencing severe cash flow difficulties—specifically, that he had experienced a deficit between rents collected and expenses for taxes, property repairs and money owed to investors and banks. Indeed, Motil admitted as much two months later, in a March 22, 2021 e-mail to investors (*see infra* ¶ 74). In the March 22, 2021 e-mail, Motil also explained: "sometime around the end of 2020, [he] realized if things didn't improve, it wasn't sustainable and we would need to make a drastic move that we really didn't want to do - liquidate." Motil intentionally or recklessly failed to disclose this to Investor A before her January 27, 2021 investment. This omission was material because a reasonable investor would have wanted to know that Motil was contemplating liquidating his assets while, at the same time, seeking investments.

54.     By January 2021, when Motil offered Investor A her Hearthstone Note, Motil owed at least fourteen other investors payment on approximately $1 million in investments that were purportedly secured by the Hearthstone Property. Motil failed to record the fourteen investors' mortgages, or Investor A's mortgage.[1] Motil intentionally or recklessly failed to inform Investor A about the other investors who were already holding notes secured by the Hearthstone Property. This omission was material because a reasonable investor would have wanted to know that the Hearthstone Property was massively overleveraged and provided little, if any security.

55.     As with Investor A's previous investments, Motil failed to record Investor A's Hearthstone mortgage, leaving Investor A's Hearthstone Note unsecured. Motil also did not pay any of the monthly interest on Investor A's Hearthstone Note. When her monthly interest went unpaid, Investor A frantically tried to reach Motil, who failed to respond to her e-mails and phone calls. Motil failed to pay Investor A the $100,000 balloon payment that became due in July 2021.

---

[1] One of the Hearthstone Property investors recorded his own mortgage shortly before Investor A received her Note and Mortgage. A second investor recorded a "deed affidavit", to which his Hearthstone Property Mortgage was attached.

56.     The value of the Hearthstone Property was far less than the $1.1 million Motil owed. Motil bought the Hearthstone Property in November 2017, for only $47,000. By January 2021, (when Motil offered Investor A's Hearthstone Note), valuation services Quantarium, Corelogic, and Collateral Analytics valued the Hearthstone Property at $117,752, $123,600, and $130,000, respectively. Thus, investors were collectively under-collateralized by at least $970,000.

57.     Motil defrauded Investor A of at least $577,240: her $429,240 investment in the Rocky River Property, $48,000 investment in the Olivesburg Property and $100,000 investment in the Hearthstone Property. This was virtually all of Investor A's life savings and retirement funds.

**B.      Investor B**

58.     Investor B, a Texas resident, is a Lieutenant Colonel in the U.S. Air Force who learned about Motil's investments from another investor on a social media website called "Biggerpockets.com." Investor B contacted Motil and scheduled a phone call with him in January 2019. During the phone call (which Investor B recorded), Investor B told Motil that he was interested in investing his and his wife's IRA retirement money. Motil acknowledged his responsibility to investors who trusted him with their retirement funds and life savings and explained that his investments were relatively low risk. Motil told Investor B that he never defaulted on a Note and was very proud of his reputation among investors.

59.     During the January 2019 telephone call, Motil also explained that he typically bought single-family houses for between $25,000 and $50,000, and that he rehabbed and did the necessary construction on the property. Motil explained that, after the renovations, the properties would be worth between $80,000 and $200,000 and he would then find tenants, resell the houses, or restructure the debt long term.

60.     During the January 2019 telephone call, Motil also told Investor B that he would

18

be an investor in a Note. Motil repeatedly assured him that the Notes would be collateralized by a first position mortgage on a property and further protected by an insurance policy that protected Investor B in case Motil suffered a catastrophic loss. Motil told Investor B that the mortgages collateralizing the Notes would be filed so that if a title company performed a search, it would see Investor B's lien on the property. Motil also told Investor B that the range of annual rate of returns on his Notes ranged from 10% to 15%, but that he liked 12% to make computations "easier for his team."

61.     Relying on Motil's representations, Investor B made a series of 4 investments in Notes totaling $175,300 from April 2019 to November 2019 as set forth below.

| Property Collateralizing Note | Principal Amount | APR % | Scheduled Monthly Payment | Term | Balloon Repayment Amount |
|---|---|---|---|---|---|
| 6220 Olivesburg Fitchville Road, Greenwich, Ohio | $61,000 | 12% | $613 | April, 2019- May, 2020 | $61,000 |
| 3318 Hearthstone Road, Parma, Ohio | $64,300 | 12% | $643 | October 1, 2019- November 1, 2020 | $64,300 |
| 13410 Wainfleet Ave., Cleveland, Ohio | $25,000 | 12% | $250 | November 8, 2019-December 1, 2020 | $25,000 |
| 11722 Longmead Ave., Cleveland, Ohio | $25,000 | 12% | $250 | December 8, 2019-December 1, 2020 | $25,000 |

**1. Investor B's First Investment: The Olivesburg Property**

62.     In or about April 2019, Investor B agreed to enter into a Note with Motil for $61,000 that was to be collateralized by the Olivesburg Property—the same property that Motil would use five months later in September 2019 to supposedly collateralize Investor A's Olivesburg Note (*supra* ¶ 48). Motil sent Investor B his version of the Note ("Investor B's Olivesburg Note") and

sent Investor B a document titled "Mortgage." Motil signed both the Mortgage and the Investor B's Olivesburg Note on behalf of a Motil LLC. Motil intentionally or recklessly failed to inform Investor B that, at the time, another investor already held a note and "mortgage" of $200,000 on the same property (*supra* ¶ 50). On or about April 11, 2019, Investor B followed Motil's deposit instructions and initiated a request that a $61,000 check be drawn from his IRA account and sent to an NS Management Chase Account.

63.     On June 17, 2020, Motil paid the outstanding principal and interest on Investor B's Olivesburg Note. Bank records show that Motil received money at 4:16 pm on June 17, 2020 from another investor, then paid $65,104.67 to Investor B at 5:13 pm that same day. Motil intentionally or recklessly failed to disclose that this was a Ponzi Payment, not derived from any legitimate source, such as rents from or the sale or refinance of the Olivesburg Property (or any other real estate operations). The omission was material because reasonable investors would have wanted to know that Motil's business was not creating sufficient profits to pay back his investments and that Motil was instead relying on new investments – in short, that Motil was operating a Ponzi scheme.

**2.  Investor B's Second Investment: Hearthstone Road**

64.     In or about October 2019, Motil solicited Investor B to enter into another Note that would be supposedly collateralized by a first lien on the Hearthstone Property. Motil would later use this same property to collateralize Investor A's Hearthstone Note in January 2021 (*supra* ¶¶ 52-56). Motil intentionally or recklessly failed to disclose that he had already issued at least five outstanding Notes totaling $295,000 to different investors, all purportedly collateralized by this one property. Investor B's Hearthstone Note had a $64,300 principal amount, was scheduled to pay 12% APR monthly from November 1, 2019 to November 1, 2020, and had a final $64,300 balloon principal repayment also due on November 1, 2020. ("Investor B's Hearthstone Note").

After Investor B transferred $64,300 to the NS Sales Chase Account, Motil sent Investor B's Hearthstone Note, via a Motil LLC. Motil also sent Investor B a document titled "Mortgage." Motil made sporadic interest payments on Investor B's Hearthstone Note totaling just over $10,000, but never paid the $64,300 balloon payment that became due on November 1, 2020.

### 3. Investor B's Wainfleet Ave. and Longmead Ave. Investments

65.     On or about November 8, 2019, Motil offered Investor B two additional Notes, each for principal amounts of $25,000 and monthly interest payments yielding 12% from December 1, 2019 to December 1, 2020, with a balloon repayment of principal at the end of the 12-month term. Motil represented to Investor B that the Notes would be secured by residential properties located in Cleveland. By their respective terms, one $25,000 Note was collateralized by a property located at 11722 Longmead Ave., in Cleveland, Ohio, (the "Longmead Property"). Motil signed the Note on behalf of a Motil LLC (the "Longmead Note"). The other $25,000 Note stated that it was collateralized by the Wainfleet Property described in ¶ 31, *supra*. Motil signed the Note on behalf of a Motil LLC (the "Wainfleet Note"). On or about November 12, 2019, Investor B followed Motil's instructions and transferred a total of $50,000 to the NS Sales Chase Account.

66.     Motil intentionally or recklessly failed to disclose to Investor B that he had already issued several Notes purportedly collateralized by the Longmead and Wainfleet Properties. When Motil issued the Longmead Note to Investor B, he already issued at least one Note to another investor that was collateralized by the Longmead property, with a balance of $60,000. When Motil sold the Wainfleet Note to Investor B, there already were four outstanding Notes collateralized by that property, totaling $172,000. After Investor B made his Wainfleet Property investment, Motil issued at least nine more Notes purportedly collateralized by the Wainfleet Property, totaling $276,000. Motil also intentionally or recklessly failed to disclose these subsequent investments to

Investor B. Only one of those subsequent investors was repaid his principal ($40,000), resulting in $433,000 worth of outstanding Notes that were purportedly collateralized by the Wainfleet Property. Motil's omissions relating to the Longmead and Wainfleet Properties were material because reasonable investors would have wanted to know that the properties that "secured" their investments were massively overleveraged and, therefore, largely useless as collateral.

67.     From December 1, 2019 to February 10, 2021, Motil made Ponzi Payments to Investor B on the Wainfleet Note and the Longmead Note, but failed to make any principal payments thereafter. By the end of February 2021, all three of Investor B's balloon payments were at least two months past due. Investor B told Motil that he needed to receive his overdue payments because he was being deployed to Afghanistan and would not be able to communicate from there. Motil then stopped responding to Investor B's attempts to reach him. At one point, Investor B became so frustrated, he posted comments on Motil's Facebook page describing his negative experience. Motil responded by blocking Investor B from posting anything more, and e-mailed Investor B that negative comments were not helpful in his effort to find a "replacement" for Investor B. In other words, Motil told Investor B that his negative posts were unhelpful in his efforts to lure another victim to invest.

C.     **Investor C**

68.     Investor C, a Florida resident, is a professor primarily involved in cancer research at a medical college. In approximately late June 2018, Investor C became aware of Motil by watching podcasts in which Motil discussed real estate investment strategies that helped "out of town" investors make money. Investor C signed up for Motil's newsletters and investment opportunities and received Motil's lists of "Private Lending Opportunities" approximately once a month. In or about late October 2020, Investor C selected a six-month Note with a face amount of

$80,000 that paid 15% annual interest, with an $80,000 balloon payment at maturity from among Motil's "opportunities." Motil listed the value of the property at $120,000.

69.     On or about October 30, 2020, after talking with Motil, Investor C wired $80,000 from his bank account located in Florida into the NS Sales Chase Account. Motil sent Investor C a Note for $80,000 that stated that it was collateralized by the Hearthstone Property ("Investor C's Hearthstone Note"). Motil also sent Investor C a document titled "Mortgage." Motil signed the Mortgage and Investor C's Hearthstone Note on behalf of a Motil LLC. Motil intentionally or recklessly failed to disclose to Investor C that he had already issued numerous Notes purportedly secured by the Hearthstone Property. (*See supra*, ¶¶ 52-56, 64.) Motil also intentionally or recklessly failed to inform Investor C that he continued to issue Notes secured by the Hearthstone Property. (*Id.*) These omissions were material because reasonable investors would have wanted to know that the properties supposedly securing their investments were grossly overleveraged.

70.     Motil used Investor C's $80,000 to make Ponzi Payments to other investors. Afterwards, Motil made a total of three payments of $1,000 to Investor C on November 30, 2020, January 26, 2021 and February 1, 2021. Each of these payments were themselves Ponzi Payments made using investments by new investors. In fact, Motil used a portion of Investor A's investment (also collateralized by the Hearthstone Property) to make the $1,000 February 1 interest payment to Investor C. Motil intentionally or recklessly failed to disclose the source of these payments to Investor C. The omission was material because reasonable investors would have wanted to know that Motil's business was not creating sufficient profits to pay back their investments and that Motil was operating a Ponzi scheme, using new investments to pay back earlier investors.

71.     After February 2021, Motil stopped making any further interest payments, and failed to make the $80,000 balloon payment due on May 1, 2021. As he had with other investors,

Motil simply stopped responding to Investor C's e-mails and phone calls.

72.     Motil's misrepresentations to Investors A, B, and C, and his misuse of their investor funds are representative of his interactions and fraudulent acts towards other victims in Motil's Ponzi scheme.

## VII.   Motil's Further Misstatements and Omissions to Investors

73.     As Motil's Ponzi scheme crumbled, he tried to mollify a growing number of panicked investors by sending mass e-mails that failed to disclose the true nature of his scheme and the problems he was facing. In one e-mail dated January 13, 2021, Motil explained that he had experienced challenging cash flow issues in August 2020 resulting from banking and tenant payment matters. He assured investors that he had everything back on track and that things were going smoothly. In the same e-mail, Motil claimed that he had to track down his largest property manager for payment. He assured investors that he was working on building up a larger cash reserve and apologized for the poor communication.

74.     In a second e-mail dated March 22, 2021, Motil explained, among other things, that he had experienced consistent cash flow difficulties over the previous few months. Motil wrote that he experienced a deficit between rent collections on the one hand, and money due to investors, banks, property repairs, and taxes on the other. Motil told investors that he recorded a podcast predicting future events in the shifting landscape of landlording. However, Motil explained that he did not want to release his podcast and "let the world know" what was going on in the market before he "moved on our stuff." Motil stated that he was not pressing the panic button, and falsely assured investors that he had enough equity in the properties to repay all investors.

75.     In both the January 13 e-mail and the March 22 e-mail, Motil intentionally or recklessly failed to include any information that he used investor money to pay personal expenses

and make Ponzi Payments. Similarly, the e-mails omitted any explanation about how Motil diverted investor money to other businesses unrelated to real estate. Moreover, Motil's March 22, 2021 e-mail was affirmatively false and misleading because contrary to Motil's assertions, the properties lacked sufficient equity to pay investors. These false and misleading statements and omissions were material because reasonable investors would have wanted to know that Motil had misused investor funds, that Motil was only able to pay back investors by using new investor funds, and that Motil lacked the equity to pay back investors.

76.      Even after sending the January 13 and March 22 e-mails, Motil continued to solicit investors to purchase Notes purportedly secured by the same properties.

**VIII.   Amy Motil Receives Ill-Gotten Gains from Motil's Fraudulent Scheme**

77.      Throughout the relevant period, Motil transferred (directly or indirectly) more than $400,000 from the Chase Accounts to his wife Amy Motil or for her benefit. Amy Motil has no legitimate claim to the ill-gotten funds and has been unjustly enriched by her receipt of these investor funds. Amy Motil should therefore be required to disgorge all of the amounts she directly or indirectly received from Motil, as well as to pay prejudgment interest on such amounts.

**FIRST CLAIM FOR RELIEF**

**Violations of Sections 5(a) and 5(c) of the Securities Act**
(All Defendants)

78.      The Commission re-alleges and incorporates by reference each and every allegation contained in Paragraphs 1 through 77 of this Complaint as if fully set forth herein.

79.      By engaging in the acts and conduct alleged in this Complaint, during the Relevant Period, Defendants, directly or indirectly, singly or in concert, made use of the means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell securities through the use or medium of a prospectus or otherwise, or carried or caused to be

25

carried through the mails or in interstate commerce, by means or instruments of transportation, securities for the purpose of sale or for delivery after sale, when no registration statement had been filed or was in effect as to such securities, and when no exemption from registration was applicable. The Notes that defendants offered and sold as alleged herein constitute "securities" as defined in the Securities Act, and as to those with terms of nine months or greater, were required to be registered with the Commission.

80.     By reason of the foregoing, Defendants have violated, and, unless restrained and enjoined, will continue to violate Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and (c)].

## SECOND CLAIM FOR RELIEF

### Violations of Section 10(b) and Rule 10b-5 of the Exchange Act
(All Defendants)

81.     The Commission re-alleges and incorporates by reference each and every allegation contained in Paragraphs 1 through 77 of this Complaint as if fully set forth herein.

82.     By engaging in the acts and conduct alleged in this Complaint, during the Relevant Period, Defendants directly or indirectly, singly or in concert, by the use of the means and instrumentalities of interstate commerce or of the mails, in connection with the purchase or sale of securities, with scienter have: (a) employed devices, schemes, or artifices to defraud, (b) made untrue statements of material fact and omitted to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and (c) engaged in acts, practices, and courses of business which operated or would operate as a fraud or deceit upon other persons.

83.     By reason of the foregoing, Defendants have violated, and, unless enjoined, will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17

C.F.R. § 240.10b-5], promulgated thereunder.

### THIRD CLAIM FOR RELIEF

**Violations of Section 17(a) of the Securities Act**
(All Defendants)

84.     The Commission re-alleges and incorporates by reference each and every allegation contained in Paragraphs 1 through 77 of this Complaint as if fully set forth herein.

85.     By engaging in the acts and conduct alleged in this Complaint, during the Relevant Period, Defendants, directly or indirectly, singly or in concert, by use of the means or instruments of transportation or communication in interstate commerce, or of the mails, in the offer or sale of securities, with scienter have: (a) employed devices, schemes, and artifices to defraud; (b) obtained money or property by means of untrue statements of a material fact or omissions to state a material fact necessary in order to make statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in transactions, practices, and courses of business which operated or would have operated as a fraud or deceit upon purchasers.

86.     By reason of the foregoing, Defendants have violated, and, unless enjoined, will continue to violate, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

### FOURTH CLAIM FOR RELIEF

**Unjust Enrichment Liability**
(Relief Defendant Amy Motil)

87.     The Commission re-alleges and incorporates by reference each and every allegation contained in Paragraphs 1 through 77 of this Complaint as if fully set forth herein.

88.     Relief Defendant has obtained funds as part, and in furtherance of, the securities violations alleged above, and under circumstances in which it is not just, equitable, or conscionable for her to retain the funds. As a consequence, Relief Defendant has been unjustly enriched.

## PRAYER FOR RELIEF

**WHEREFORE**, the Commission respectfully requests that this Court enter judgment:

### I.

Permanently restraining and enjoining Defendants, their agents, servants, employees and attorneys, and all persons in active concert or participation with them, who receive actual notice of the injunction by personal service or otherwise, and each of them, from committing future violations of each of the securities laws and rules promulgated thereunder as alleged herein and from participating directly or indirectly in the issuance of purchase, offer or sale of any security (provided that such order would not prevent the buying and selling securities listed on a national securities exchange for their respective personal account).

### II.

Permanently barring Motil from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l] and that is required to file reports under Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)] pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 78t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)].

### III.

Directing Defendants to disgorge all ill-gotten gains, with prejudgment interest, on a joint and several basis, with prejudgment interest thereon.

### IV.

Ordering Relief Defendant to disgorge all funds obtained as part, and in furtherance of, the securities violations alleged above, with prejudgment interest thereon.

## V.

Ordering each of the Defendants to pay civil money penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

## VI.

Creating a Fair Fund pursuant to Section 308(a) of the Sarbanes-Oxley Act.

## VII.

Granting such other and further relief as the Court may deem just and appropriate for the protection of investors pursuant to Section 21(d)(5) of the Exchange Act [15 U.S.C. §78u(d)(5)].

## **JURY DEMAND**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the SEC hereby demands trial by jury.


Dated:  September 25, 2023                    Respectfully submitted,

                                             /s/ *John B. Timmer*

                                             John B. Timmer (D.C. Bar No. 997309)
                                             TimmerJ@sec.gov

                                             COUNSEL FOR PLAINTIFF
                                             Securities and Exchange Commission
                                             100 F Street, N.E.
                                             Washington, DC 20549
                                             T: (202) 551-7687